[Opinion delivered June 21, 1880.]

------

RICHARD S. AND EASTER E. SKAGGS v. S. H. MULKEY.

(Case No. 4196.)

1. HOMESTEAD.—The defendant, Richard S. Skaggs, exchanged an interest in a mill for a tract of land in Johnson county, and, because it was rented out for that year, took a bond for title. Before occupying the land he purchased of S. H. Mulkey, on a credit, a half interest in a mill at Fort Worth, for $1,600, assigning as additional security the title bond for the Johnson county land, and afterward caused a deed to be made to Mulkey therefor. Failing to pay for the mill property, his interest in it was sold under foreclosure proceedings, leaving a large portion of the debt unpaid. Skaggs separated from his wife, and she, after a time, moved on the Johnson county land. Afterwards the husband returned to his family, and they were living on the land when Mulkey brought suit for it.

The land never having been occupied as a homestead before the title bond to it had been assigned and used as a credit in making the purchase of the Fort Worth mill property, the claim of Mulkey was superior to any homestead rights of Skaggs or his family, and the judgment of the court holding the deed to Mulkey a mortgage for the balance due on the mill, and ordering a sale of the land to satisfy it, was not erroneous. Baird v. Trice, 51 Tex., 555; Thompson on Homestead, secs. 244, 245, 255.

APPEAL from Johnson. Tried below before the Hon. Jo. Abbott.

On the 10th day of June, A. D. 1876, Mulkey, in the district court of Johnson county, Texas, brought an action of trespass to try title against R. S. Skaggs, one of the appellants, for two hundred acres of land, situated in Johnson county, a part of the B. S. Jenkins survey No. 28, and fully described in the original petition. On the 23d day of June, R. S. Skaggs, one of the appellants, filed a general demurrer and general denial. On the 20th day of December, 1877, Easter E. Skaggs, one of the appellants, and wife of R. S. Skaggs, by leave of the court made herself a party defendant, and they filed their amended answer, in which they alleged: That in 1874 they owned a one-half interest in certain property, situated in Hill county, Texas, known as the Winney Mills, upon which they then resided as their homestead. That on the 3d day of February, A. D. 1874, they exchanged the said mill property for the land in controversy with one John Winney, and that said Winney, not being in an attitude to make a deed, executed to R. S. Skaggs his bond for title. That R. S. Skaggs traded for the land in controversy with the intention of making the same his homestead, and as an evidence of this that they sent some of their plunder upon the said land, etc., and would have taken possession but that one Knight held it as tenant of John Winney.

That R. S. Skaggs then purchased of appellee a one-half interest in certain property situated in Fort Worth, Tarrant county, Texas, known as the "Fort Worth Mills," for which he agreed to pay him $1,600, for which sum R. S. Skaggs executed his note for $1,600, and to secure its payment

transferred the said title bond which he had gotten from Winney for the land in question to appellee. That when John Winney got ready to make an absolute deed to the land in question, R. S. Skaggs procured John Winney to make the deed to appellee, but that the same was done without the consent or knowledge of Easter E. Skaggs; and further, that said deed was only intended as a mortgage to secure appellee in the payment of the said $1,600. That at the June term of the district court of Tarrant county, Texas, appellee instituted suit against R. S. Skaggs on the $1,600 note, and procured judgment with decree of foreclosure on the Fort Worth mill property, had the same sold and bought in at $600, etc., and failed to give appellants credit for the said $600. A copy of judgment and execution, etc., is made part of answer. That at the time of the transfer of the title bond and the making of the deed, the land in controversy was the homestead of appellants, and that they were in possession thereof, etc.

On the 6th day of June, A. D. 1879, appellee filed his supplemental petition, alleging the following, to wit:

1st. Admitting the sale of the Hill county mill property to John Winney, the purchase of the land in question and the execution of the title bond, etc.

2d. Denying that the land in question was purchased for a homestead by appellants, or that the same was or ever had been the homestead of appellants.

3d. Admitting the sale of his one-half interest in the Fort Worth mill property to appellant R. S. Skaggs for $1,600; the execution of the note, transfer of the title bond, and the execution of the deed from John Winney to appellee; that all this was done with the knowledge and implied consent of Easter E. Skaggs.

4th. That R. S. Skaggs was a miller by profession, and that his sole object and purpose of exchanging the Hill county mill property for the land in question was to enable him to purchase appellee's interest in the Fort Worth mill property and not for the purpose of a homestead.

5th. That, immediately upon the trade with appellee, ap-

pellants removed to Fort Worth, Tarrant county, Texas, and took possession of the mill, and that in the month of November, A. D. 1874, R. S. Skaggs, finding that he could not pay appellee the $1,600 note, caused John Winney to execute to appellee his deed to the land in controversy, the consideration expressed in the deed being $1,600, but with the understanding that if appellee could sell the land for $1,600 he would give up the note; otherwise he would give him a credit of $1,000 on the note.

6th. That appellants continued to reside near and control the Fort Worth mill till in 1876, when they separated, and R. S. Skaggs left the state; that after the separation Easter E. Skaggs continued to live at Fort Worth, and off of the income derived from the mill, for several months, and then she left Fort Worth and went upon the land in controversy, and claimed it for the first time as a homestead; that prior to 1876 they had never claimed or held possession of the same as a homestead by tenant or otherwise.

7th. That appellee did bring suit on the $1,600 in Tarrant county and foreclose his vendor's lien on the mill property, and buy same in at $300, for which amount he gave appellants credit, and that appellant, R. S. Skaggs, was still indebted to him in the sum of $1,200.

8th. Concluding with prayer as in his original petition, and with an alternative prayer to the effect that in case the court should construe the deed from John Winney to appellee as a mortgage, for judgment for debt, with decree of foreclosure, etc.

The statement of facts shows substantially the following: Mulkey, the plaintiff, testified "that he resided in Fort Worth. Knows defendants. In the spring of 1874 they resided in Johnson county, living in Cleburne, keeping house; defendant R. S. Skaggs working at Lott's mill. In the spring of 1874 defendant R. S. Skaggs came to Fort Worth, and proposed buying of witness his half-interest in the Fort Worth mill property. . . . A short time afterwards witness and his brother visited the land in controversy, on which a tenant, Knight by name, was residing. We went to Cleburne,

where defendants were residing, and R. S. Skaggs agreed upon the trade. I sold him the Fort Worth mill property for $1,600, and took his note for the amount, with the vendor's lien; and, as additional security for its payment, the defendant transferred to me the title bond which he held from John Winney for the land in controversy. The trade was made in town, but the note was written in the dwelling-house of defendant, and the transfer of the title bond was made in writing, and at the same time and place; and were both delivered to me in the said house of defendants, in Cleburne, Texas. It was in the spring or summer of 1874. Soon after the trade, defendants, with their children, removed to Fort Worth, Tarrant, county, Texas, and rented a dwelling-house near the mill; and defendant R. S. Skaggs went to work in the mill, and in a short time I executed to him my deed to a half-interest in the Fort Worth mill property, retaining a lien for the purchase money.

"In a few months defendant R. S. Skaggs found he would be unable to pay, and, learning that Winney was ready to make a deed to the land in controversy, came to me and requested me to have the deed to the land made direct to me. This I consented to do, and gave the bond to defendant, and requested him to go to Hill county and have Winney to make the deed. This he (Skaggs) did, and in a few days returned and delivered me the deed of John Winney, together with the title bond. . . .

"I took possession of the land, and rented it in the year 1875. Collected the rent, and paid some of the debts of defendant with it for which I was surety. The defendants, Skaggs and family, continued to reside in Fort Worth till the beginning of the year 1876. The defendant R. S. Skaggs and his wife separated, and R. S. Skaggs left the country. His wife remained two or three months, and then left and came down to Johnson county and took possession of the land. In that year defendant R. S. Skaggs returned to his wife, and they were in possession of the land at the time of the institution of the suit. . . . Defendants, nor either of them, ever told witness the land was bought by them for a home-

stead. They were not living on it at the time of my pur-
chase, and had never lived upon it at all. The land is about
fifteen miles southwest of Cleburne, where they resided at
the time. Did not speak to Mrs. Skaggs. Don't know
whether she knew anything of the trade, though I supposed
she did, as we all talked the trade over in her house. She
came into the room one time; can't say she heard us. She
made no objection to the trade. She moved with her hus-
band to Fort Worth, and lived there with him. . . .
After Skaggs left the mill was rented at $50 per month —
the money going to pay mill debts and debts of Skaggs for
which plaintiff was surety. . . . The vendor's lien was
foreclosed, and $300 realized. No credit was allowed in the
suit for the land. Witness could not get possession of it," etc.

It was agreed that both parties claimed under Winney.
The title bond from Winney to Skaggs bore date 3d Febru-
ary, 1874, and acknowledged payment. The assignment by
Skaggs of the title bond was read in evidence; also deed
from Winney to plaintiff of date November 3, 1874, for the
land. Also Mulkey's deed to Skaggs for one-half interest in
Fort Worth mill property, of date August 10, 1874.

The testimony for defendants, in substance, is as follows
(from brief for them):

R. S. Skaggs testified that he fully paid John Winney the
purchase price of said land; that when he acquired it he
was a married man, had four children, and that E. E. Skaggs
then was and now is his wife; that he bought it with the
intention of making it his home, but that it was rented to
one Knight for that year; that Knight became his tenant,
and that he sent him on the premises a bedstead, some
chickens, and other articles, until he should return to the
place, which he intended doing as soon as Knight's term of
lease was out; that he afterwards came to Cleburne, and,
while living there in a rented house, made this trade with
plaintiff for the Fort Worth mill property, and that, when
he returned to the land, the dog, and chickens, and bedstead,
were gone.

Mrs. E. E. Skaggs testified that Skaggs traded for said

land for a homestead, and would have moved upon it instead of coming to Cleburne in the spring of 1874, but that he could not get possession; that defendants intended to move upon it as soon as Mr. Knight's lease was out, which was the following winter, and that with this intention she sent some of her things over there when defendants moved to Cleburne in the spring or summer of 1874; that she always intended to move back upon the land and hold it as her homestead.

Mr. Knight testified that he lived on the land when defendants bought it from Winney; that R. S. Skaggs and Winney came to him in his field and told him of the trade, and he agreed to become Skaggs' tenant; that Skaggs said to him that he was getting old and had bought this place for a home for his wife and children; that he intended for them to live there while he run the mill business. This was before defendants removed from the Winney mill property to Cleburne; that about the time they started from there to Cleburne, witness came by their house and they asked him to take home with him part of their things; that he brought one bedstead, a gun, some chickens, and a box with something in it; that defendants told him to take care of them until they should call for them, which, from what R. S. Skaggs had previously said in the field, witness understood to mean when they moved on the land, which he supposed they would do when he got off. Witness left the place in the fall of 1874.

Mr. Hopkins testified that while defendants were residing in Cleburne in the spring of 1874, and soon after they acquired this land, they stated to him that they had bought it for a home.

In rebutting, Geo. Mulkey, in substance testified: "Am brother of plaintiff. Knew defendants in 1874, when I resided in Cleburne and ran a mill. In the spring became acquainted with defendant, who was working at Lott's mill, in Cleburne. He told me had sold his mill property in Hill county and had purchased some land which he wanted to trade for some good mill property elsewhere. That he

wanted to get away from the Brazos, for his family was always sick with the chills. I told him my brother owned a half interest in the Fort Worth mills·and was anxious to sell, and I thought he could make a trade. He said he would go up and see him. I then gave him a letter of introduction to my brother and he went up to the Fort and saw him. In a short time my brother came down and I went with him to look at the land in controversy. We came back and traded with defendant. Defendant gave him $1,600, in a note with vendor's lien on the Fort Worth mill property, and took a transfer of the title bond which defendant then had for the land in controversy as a security for the payment of the note. I wrote the note and also the transfer of the bond at the house of defendants, in Cleburne. The defendant Mrs. Skaggs was in the room while we were writing and talking of the trade. We talked in an ordinary tone. The room was small, and I think she must have heard what we were talking about. I know she was in the room once. I remember speaking to her about looking so badly and about getting out of that sickly country. She made no objections to the trade and said nothing about it. I do not know that she understood what the trade was. After the trade both defendants removed to Fort Worth and rented a dwelling-house near the mill, and continued to reside there until fall of 1875, when defendant left his family and the state. Two or three months afterwards Mrs. Skaggs sold her hogs about the mill for·a horse, and left, saying she was going to her sister's, near Cleburne. I never heard of her on the land in controversy. The deed to the land was executed to plaintiff· by Winney, at request of defendant." . . . (Testimony touching conditions of the deed, etc., and same as plaintiff.) "I knew as much about the trade as plaintiff, because I helped to make it. I did not know that defendant drank to excess until six months after he moved to Fort Worth, when he became dissipated, neglected his business, became involved in debt. . . . I ran the mill and rented it after defendant left." . . .

The case was tried without a jury, and October 2, 1879,

judgment was rendered for plaintiff against Skaggs for $1,500, with decree subjecting the land to the debt and ordering sale for costs. The defendants appealed and assigned errors:

1st and 2d. Error in holding that the deed from Winney to plaintiff was a valid lien in preference to the homestead rights of defendants.

3d. The pleadings were insufficient to support the judgment as rendered; and

4th. The judgment is against the law and evidence, the testimony showing that the land was the homestead at the time of the execution of the instrument under which plaintiff claims, and said document is not executed by the wife so as to conclude her rights, nor is there evidence of abandonment.

*Oatis & Kouns,* for appellants.

*W. Poindexter,* for appellee.

A. S. WALKER, J.— The questions submitted really constitute but the one issue, whether the court erred in holding the land subject to the debt as against the homestead rights of the defendants.

The testimony shows an exchange of lands made February 3, 1874, in which R. S. Skaggs received a title bond for the land in controversy, acknowledging payment. The land was in the possession of a tenant for that year, so that Skaggs and family could not move upon it. The tenant, however, at once attorned to Skaggs.

Upon this the equitable title to the land became complete; and had the homestead been fixed upon it by any mode recognized by the law, its quality as such would not be changed save by conveyance by husband and wife, with her privy acknowledgment, or by its abandonment as the homestead.

There is testimony of declarations of intent to make the property the homestead — made by both husband and wife. These declarations, and the testimony given as to such in-

tent as a fact, together with the evidence that a few articles of furniture and personal property were sent to and left on the place soon after its purchase, are relied on by the defendants.

On the other hand, is *the fact* that no *residence* ever was fixed upon the land until the early part of the year 1876, more than one year after the title bond had been used as a means of credit in the purchase of the Fort Worth mills, and subsequent to the conveyance to plaintiff of the legal title by Winney.

Add to this, that Skaggs and his family resided, subsequent to his purchase, at Cleburne, in business some distance from the land, and that he sought out the plaintiff and traded with him, using the title bond as security, without disclosing his intentions respecting the homestead; that contrary declarations touching his intent were made to Geo. Mulkey, that he wished to trade the land for mill property, and had bought it for that purpose; the subsequent movements of the family; the probability of Mrs. Skaggs' participation in the trade, etc.

The presumption of the continuance of *homestead* cannot be invoked until it be shown to have existed. The cases, therefore, of Gouhenant *v.* Cockerell, and Sylvan *v.* Coffee, do not apply.

The case of Baird *v.* Trice, 51 Tex., 555, recognizes the superiority of even an attachment lien, as against an intervening homestead, subsequent to the levy and prior to the sale.

If the land was not homestead at the date of the assignment of the title bond to plaintiff, the subsequent occupancy by the defendants would not avoid his lien.

In the absence of any actual residence (or probably of a record destination), what would be a designation or dedication, and whether it exists, are questions of fact and not of law.

What acts short of occupancy in fact will or will not be evidence of a destination; what public or private expressions of intent as to future occupancy as homestead will make

the property a home, cannot, as matters of law, be decided. The destination as a fact is to be determined by the jury or court, from the testimony in each case.

We consider that there was not necessarily error in the court holding, from the testimony, that the intent to make the place their home, not followed by any actual occupancy, was ineffectual as a destination of it as homestead against the creditor obtaining a lien, knowing the land had· never been so occupied, and ignorant of any intent to constitute .it a homestead at the date of his lien. Thompson on Homestead, §§ 244, 245, 255.

Finding no error, the judgment below should be affirmed.

AFFIRMED.